## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

_ _ ˉ 3

DAVID MUDGE,                                    )
            Plaintiff        )
                        )      ` 2 0 GAO
v.                                              )
                        )
                        )          **COMPLAINT**
UNUM LIFE INSURANCE                             )
COMPANY, aka                                    )
UNUMPROVIDENT INSURANCE )
COMPANY & COMPAQ CORP.    )
AND AFFILIATED COMPANIES MAGISTRATE JUDGE ____
LONG TERM DISABILITY PLAN, )
aka, HEWLETT-PACKARD CO.    )
GROUP LONG TERM DISABILITY)
PLAN,                                           )
            Defendants      )
                        )

RECEIPT # ____
AMOUNT $150
SUMMONS ISSUED yes
LOCAL RULE 4.1 ____
WAIVER FORM ____
MCF ISSUED ____
BY DPTY. CLK ____
DATE 11 30 04

## INTRODUCTION

1.    Plaintiff, David Mudge ( "Mr. Mudge"), brings this action against the Defendants, Unum

    Life Insurance Company, aka, UnumProvident Insurance Companies, ( UNUM) and

    Compaq Corporation and Affiliated Companies Long Term Disability Plan, aka, Hewlett-

    Packard Company Group Long Term Disability Plan ("Plan")( collectively referred to as

    "Defendants") for violation of the Employment Retirement Income and Security Act of

    1974, as amended, 29 U.S.C. § § 1001 *et. seq.* ("ERISA"). Mr. Mudge is a participant in

    an ERISA welfare benefit plan that was issued to Compaq Computer Corporation

    (Compaq"), and underwritten and insured by UNUM. The name of the welfare benefit

    plan is The Compaq Computer Corporation Long-Term Disability . The Plan number is

24768 001.

2.      This Complaint challenges: (1) the Defendants unlawful termination of Mr. Mudge's Long Term Disability ("LTD") total disability benefits without appropriate justification and without granting him a full and fair review of his claim for benefits; and (2) UNUM's pattern of rejecting and/or ignoring the opinions of Mr. Mudge's treating and examining physicians in an attempt to deprive him of the appropriate LTD benefits he is due; and (3) UNUM's failure to provide a reasonable claims procedure that would yield a decision on the merits of Mr. Mudge's claim.

3.      Mr. Mudge is filing this action to recover benefits due under the Plan, to enforce the present rights existing therein, to clarify rights under the terms of the Plan, and to recover costs and attorneys' fees as provided by ERISA.

**JURISDICTION**

4.      This Court has personal and subject matter jurisdiction over this case under 29 U.S.C. § 1132(e)(2) and (f), without regard to jurisdictional amount or diversity of citizenship, in that the Plan is administered in this district.

**PARTIES**

5.      Mr. Mudge is a 48 year-old individual who currently resides in Nashua, New Hampshire. Mr. Mudge is a vested participant in a UNUM employee benefit plan, within the meaning of 29 U.S.C. § 1002 (2)(7).  Mr. Mudge has standing to bring this action under 29 U.S.C. § 1132(a).

6.      The defendant, UNUM, is a for-profit corporation with its principal place of business at Portland, Maine.  UNUM transacts business in Massachusetts and insures and underwrites the Plan under which Mr. Mudge is suing.  UNUM is the party responsible

2

for processing claims made under the Plan and making a final determination as to Plan participants' eligibility for LTD benefits.

7.    At all times relevant to the claims asserted in this Complaint, UNUM purported to act as an ERISA claims fiduciary with respect to participants of the Plan, generally, and specifically, with respect to Mr. Mudge, within the meaning of ERISA.

8.    The Plan under which Mr. Mudge is suing is a "long term disability plan" issued by UNUM to Compaq, a Massachusetts company with its principal place of business at Houston, Texas. The Group Plan Number is 24768 001. (**See Exhibit A**).

## STATEMENT OF FACTS

### Insurance, Entitlement, Definitions of Disability, Discretion

9.    In December 1976, Mr. Mudge began working at Digital Computer Corporation in Maynard, Massachusetts. Compaq Computer Corp acquired Digital on January 26, 1998. Compaq Computer Corp was subsequently acquired by Hewlett- Packard in 2002.

10.   Mr. Mudge became insured under the UNUM Plan on or about the time of the Compaq acquisition of Digital in January 1998.

11.   UNUM both funds and administers the Plan under which Mr. Mudge is suing.

12.   The Plan does not contain any provisions giving independent and final discretion to UNUM to determine eligibility for benefits or to interpret the terms of the Plan.

13.   The Plan provides for the payment of LTD benefits when an insured person becomes either totally disabled.

14.   The Plan defines total disability in the following manner:

      " You are disabled when Unum determines that:

      (a) You are limited from performing the material and substantial duties of your regular

3

occupation due to sickness or injury AND you have a 20% or more loss of indexed monthly
earnings due to same sickness or injury".

     (b) After 24 months the definition of disability states: " you are disabled when UNUM
determines that due to the same sickness or injury, you are unable to perform the duties of any
gainful occupation for which you are reasonably fitted by education training or experience".

15.     Under the Plan, benefits are payable until the insured is no longer disabled, or until the
age of 65.

16.     Except for the definition, of "Totally Disabled" quoted above in this Complaint, the Plan
contains no other definition or explanation of the terms disability.

17.     At the time that his benefits were terminated, Mr. Mudge was receiving approximately
$4,029 in monthly benefits under his plan.

## Mr. Mudge's Claim for LTD Benefits

18.     Mr. Mudge has presented a timely claim to UNUM, asserting that he is an insured person,
that he became totally disabled while insured, and that he is entitled under the Plan to
LTD benefits for the period of time beginning in January 31, 2002 when UNUM
wrongfully terminated his benefits, and continuing thereafter without interruption through
the present, and continuing in the future until he reaches the age of 65 or is no longer
disabled.

## Mr. Mudge's Application for LTD Benefits

19.     Mr. Mudge suffers from Multiple Sclerosis ("MS").

20.     Mr. Mudge first began experiencing symptoms of MS in 1998. Mr. Mudge was formally
diagnosed with MS in March 1999. He became unable to work in November 1999.

21.     Mr. Mudge has been receiving treatment from Marion Stein, MD, Beth Israel Hospital,

330 Brookline Avenue, KS 406, Boston, MA since January 2002.

22. Mr. Mudge has also received treatment from Agnes Virga, MD from 1999 through November 2001.

23. On or about May 2000 Mr. Mudge applied for LTD benefits under the Plan. As part of his application for benefits, Dr. Virga completed an Attending Physician Statement, which stated that Mr. Mudge was diagnosed with MS. Dr. Virga further stated, in pertinent part: "can not perform his job at all. Severe fatigue, pains, cognitive dysfunction."

24. After approving benefits, UNUM continued to engage in periodic reviews of Mr. Mudge's claim file, requesting updated Claimant Questionnaires, Physical Capacities Evaluation Forms and Attending Physician Statements. UNUM also requested that Mr. Mudge sign periodic authorizations to release his medical information to UNUM, with which Mr. Mudge complied.

26. On December 4, 2000 The Social Security Administration found Mr. Mudge disabled effective November 1, 1999.

27. On November 26, 2001 Robert Murphy, an investigator for UNUM, came to Mr. Mudge's sister's home in Andover, Massachusetts, to conduct an interview of Mr. Mudge on behalf of UNUM. In that report Mr. Murphy observed " Mr. Mudge trembled and jerked slightly throughout our conversation, which lasted approximately one hour". He continues on to say in pertinent part: " His other major limitation, which was quite noticeable, was his spasticity. As described above, even though he tried to control it, he was spasming throughout our conversation."

29. Throughout UNUM's payment of Mr. Mudge's claim, Dr. Virga continued to certify Mr.

5

Mudge's disability.

## Medical Review of Mr. Mudge's Claim

30.    On January 15, 2002 Alan Neuren, MD in-house medical consultant to UNUM conducted a paper review of Mr. Mudge's claim file. He concluded that it is " not clear from the records if the claimant does have MS. There are some suggestive features, but there are other aspects that raise concern about the diagnosis. The claimant's subjective complaints are out of proportion to his objective findings".

## Termination of Mr. Mudge's Benefits

31.    On January 31, 2002 Shannon Rosebrook wrote to Mr. Mudge informing him that UNUM had decided to terminate his benefits in part because " there is no objective evidence on file to support claimant's subjective complaints". " If subjective complaints of cognitive dysfunction were that severe, client would have sought additional neuropsych testing to seek appropriate treatment of such symptoms".

32.    Mr. Mudge received this letter on or about February 4, 2002.

## Mr. Mudge's Appeal of UNUM's Termination of His Benefits

33.    On March 8, 2002, Mr. Mudge, through counsel, appealed UNUM's termination of his LTD benefits.

34.    On April 10, 2002 as part of his appeal, Mr. Mudge submitted a neuropsychological evaluation completed by Arthur Gavin, PhD.

35.    On May 17, 2002 as part of his appeal, Mr. Mudge submitted office notes of Dr. Marion Stein.

## UNUM's Review of Mr. Mudge's Appeal

36.    On May 3, 2002, Jana G. Zimmerman, PhD, an in-house consultant reviewed Mr.

Mudge's claim file. She conducted a neuropsychological review, reviewing the submission of Dr. Gavin's evaluation of Mr. Mudge. She concluded that the " the diagnosis of dementia secondary to MS is not supported by the sparse test findings. Borderline or slight impairment of delayed visual memory does not rise to the level of impairment that would preclude a return to work".

## UNUM Upheld the prior termination

37.    On May 22, 2002 an unsigned letter from UNUM was sent to Mr. Mudge affirming the prior termination citing only the paper review of Dr. Zimmerman conducted on May 3, 2002. The letter than went on to say that Mr. Mudge's file was being sent to UNUM Quality Performance/Appeals Unit for a formal appeal.

38.    On May 29, 2002 Ms. Jeanne Flaherty wrote a letter to Mr. Mudge acknowledging receipt of his appeal .

39.    On May 30, 2002, Ms. Flaherty sent to counsel for Mr. Mudge a "complete copy of Mr. Mudge's file" and notified counsel that Mr. Mudge's case was being sent to UNUM's on-site physician with the office note of Dr. Stein submitted on May 17, 2002.

## Subsequent Medical Review's of Mr. Mudge's claim

40.    On June 14, 2002 Mr. Mudge's claim file was again reviewed by Dr. Alan Nueren. He stated that " there are inconsistencies between what Dr. Stein reports and what Dr. Virga reports. Given the potential seriousness of bladder in individuals with MS, it is inconsistent that Dr. Virga would have overlooked this or not instituted treatment had the client mentioned it". He continued on to say: "When last seen by Dr. Virga, she felt there was no evidence of progression and that he was in remission. Although Dr. Stein felt that he presented was compatible with primary progressive MS this is inconsistent with Dr.

Virga's not finding evidence of progression."

He concluded that " The new records do not provide evidence that he was not in remission between the time of his last visit with Dr. Virga and when his case was closed."

## Subsequent Submission of Medical Evidence in Support of Mr. Mudge's Claim

41.    On June 14, 2002 UNUM sent a letter to counsel for Mr. Mudge stating that counsel could submit additional medical information from Dr. Stein prior to July 10, 2002.

42.    On July 18, 2002 counsel for Mr. Mudge submitted further medical records from Dr. Stein along with a residual functional capacity evaluation form.

## UNUM Upheld Prior Termination

43.    On July 29, 2002 Ms. Rosebrook wrote to counsel for Mr. Mudge upholding the prior termination of Mr. Mudge's benefits.  In the letter, she referred to counsel's submission of new evidence dated July 18, 2002 as being " too late and not reviewed".  She concluded in pertinent part: " Our on-site physician concluded that the diagnosis of MS was not substantiated by the medical record in his file".

44.    On August 1, 2002 counsel for Mr. Mudge wrote to Julianne Demers confirming that the July 29, 2002 letter upholding the termination was based upon Dr. Neuren's June 14, 2002 file review and no other medical evidence had been reviewed.  In the letter, counsel suggested that Dr. Neuren place a phone call to Dr. Stein to clarify any questions he may have regarding Mr. Mudge's treatment. Counsel for Mr. Mudge stated that more medical evidence would be submitted.

## Additional Submission of Evidence

45.    On October 2, 2002 Counsel for Mr. Mudge wrote to UNUM requesting additional time to submit further evidence from Mr. Mudge's treating physician, Dr. Marion Stein.

8

46.    On November 5, 2002 Mr. Joel Kenniston from UNUM wrote to counsel for Mr. Mudge
       and stated that Dr. Stein had called to speak to Dr. Neuren on September 23, 2002. Mr.
       Kenniston concluded that sufficient time had been extended to allow for the submission
       of any additional relevant information.  The phone calls placed by Dr. Stein were refused
       by Dr. Neuren.

47.    On November 11, 2002 counsel for Mr. Mudge wrote to Mr. Kenniston and pointed out
       that UNUM had not properly provided a copy of all medical reviews to counsel prior to
       the last decision upholding the termination of benefits.

48.    On December 10, 2002 Counsel for Mr. Mudge submitted a lengthy and detailed report
       from Dr. Stein outlining Mr. Mudge's MS diagnosis, treatment and the limitations on his
       daily activities.

## Subsequent UNUM Medical Review

49.    In counsel for Mr. Mudge's letter of December 10, 2002 counsel outlined for UNUM that
       Dr. Neuren should not be involved in any further appellate review of Mr. Mudge's claim
       as he was the on-site doctor that initially reviewed Mr. Mudge's claim prior to the
       original termination decision and also reviewed the file again post appeal.

50.    On January 9, 2003 Mr. Kenniston wrote to counsel for Mr. Mudge stating the matter had
       been referred back to on-site medical resources.

51.    On January 21, 2003 Mr. Kenniston wrote to counsel for Mr. Mudge requesting
       additional medical notes.

52.    On February 4, 2003 counsel for Mr. Mudge wrote to Mr. Kenniston pointing out again
       why Dr. Neuren should not be involved in reviewing Mr. Mudge's claim and enclosing
       the requested medical notes.

53.    On March 4, 2003 Mr. Kenniston wrote to counsel for Mr. Mudge and stated that the file is back under review with Dr. Neuren and stated that since the claim is a 1999 claim the post January 1, 2002 regulations do not apply to Mr. Mudge's case.

54.    On March 5, 2003 counsel for Mr. Mudge wrote to Mr. Kenniston again stating that Dr. Neuren should not be involved in the review of Mr. Mudge's claim.

55.    On March 14, 2003 Dr. Neuren again reviewed Mr. Mudge's claim and concluded in pertinent part: " No indication that the insured was experiencing urological problems at the time claim was denied. Dr. Stein may have found deficits that were not noted by Dr. Virga. At the time of the initial review, Dr. Stein had not examined the insured. Given that the insured's condition appeared to be stable, that he was not experiencing symptoms, and his examinations failed to document deficits that would rise to the level of impairment, it would be difficult to support the contention that the insured was disabled by MS given the paucity of the findings".

56.    On March 20, 2003 Mr. Kenniston wrote to counsel for Mr. Mudge upholding the original termination decision based on the March 14, 2003 file review by Dr. Neuren.

**Subsequent Submission by Mr. Mudge**

57.    On October 30, 2003 Dr. Agnes Virga wrote to counsel for Mr. Mudge. In her letter, she stated that she treated Mr. Mudge from March 17, 1999 until November 15, 2001. She stated in pertinent part: " There is no doubt, based on Mr. Mudge's clinical presentation, imaging study, spinal fluid and laboratory results, that he does have demyelinating disease, MS. Even in Mr. Mudge did not have severe exacerbations, he did not get back to baseline functioning and continued to have quite debilitating symptoms. 'Remission' in a patient with demyelinating disease does not mean that the patient has not symptoms.

'Remission' means that the patient does not have a serious exacerbation. The level of 'remission' might even mean being wheelchair bound or totally unable to function at work, but not having any new severe symptoms representing another new focus or MS plaque. Fortunately, 'remission' in Mr. Mudge's case did not mean a very severely dysfunctional baseline, but nevertheless represented a continued problems with cognitive functioning, memory, recurrent visual disturbances and balance problems."

58.     On January 22, 2004, counsel for Mr. Mudge wrote to Mr. Kenniston submitting the new evidence from Dr. Virga supporting Mr. Mudge' disability.

59.     On March 11, 2004 Mr. Kenniston wrote to counsel for Mr. Mudge stating that no further evidence would be accepted . Mr. Kenniston refused to review the letter from Dr. Virga and returned the letter to counsel for Mr. Mudge.(**See Exhibit B**)

60.     Mr. Mudge has exhausted his administrative remedies pursuant to 29 C.F.R. 2560.503-1(1).

61.     UNUM has failed to meet the minimum requirements for the denial of Mr. Mudge's LTD benefits, in violation of ERISA, 29 U.S. C. § 1133, which requires that upon a denial of benefits, the admistrative review procedure must include a reasonable opportunity for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

62.     UNUM also failed to meet the Plan requirement for review of claims that have been denied.

63.     UNUM has failed to meet its burden of establishing that Mr. Mudge's condition had changed to such a degree that he was no longer totally disabled under the terms of the Plan.

64.     UNUM failed to provide Mr. Mudge a full and fair review of his claim for LTD benefits.

11

65. The self-serving nature of UNUM's decision that Mr. Mudge is no longer disabled is illuminated by the fact that Mr. Mudge's condition has not changed, but in fact, has only worsened, since UNUM first accepted liability on his claim for benefits.

66. The decision to deny Mr. Mudge's benefits was wrongful, unreasonable, irrational, solely contrary to the evidence, contrary to the terms of the Plan and contrary to law.

67. UNUM was influenced by its financial conflict of interest, as both the administrator of the Plan and the payor of benefits thereunder, when it denied Mr. Mudge's benefits.

68. Due to the unlawful denial of benefits under ERISA, Mr. Mudge has lost his rightful long term disability benefits.

69. Mr. Mudge has also suffered emotional distress and an exacerbation of his physical condition as a result of UNUM's actions.

70. Due to the unlawful denial of benefits under ERISA, Mr. Mudge has also lost the use of his long term disability benefits.

71. Having exhausted the administrative procedures provided by UNUM, Mr. Mudge now brings this action.

## FIRST CAUSE OF ACTION
### ( Enforcement of Terms of Plan
### Action for Unpaid Benefits)
### (ALL DEFENDANTS)

72. Mr. Mudge realleges each of the paragraphs above as if fully set forth herein.

73. The Plan is a contract.

74. Mr. Mudge has performed all of his obligations under the contract.

75. 29 U.S.C. § 1132(a)(1)(B) states that:

A civil action may be brought—

12

    (1) by a participant of beneficiary-

        (A) for the relief provided for in subsection ( c) of this section, or

        (B) to recover benefits due to him under the terms of his plan, to enforce

           his rights under the terms of the plan, or to clarify his rights to future

           benefits under the terms of the plan.

76.    The Defendants' actions constitute an unlawful denial of benefits under ERISA, as

      provided in 29 U.S.C. § 1132 (a) (1) (B).

77.    In accordance with 29 U.S.C. § 1132 , Mr. Mudge is entitled to be paid benefits under the

      Plan based upon his disabled status from and after January 2002 and continuing into the

      present.

78.    The Defendants have refused to provide Mr. Mudge with these disability benefits and are,

      therefore, in breach of the terms of the Plan and ERISA, which requires that the

      Defendants engage in a full and fair review of all claims and the administration of the

      Plan in the best interests of the Plan participants.

79.    As a direct and proximate result of this breach, Mr. Mudge has lost the principal and the

      use of his rightful LTD benefits.

## SECOND CAUSE OF ACTION
### (Attorneys' Fees and Costs)
### (ALL DEFENDANTS)

80.    Mr. Mudge realleges each of the paragraphs above as if fully set forth herein.

81.    Under the standards applicable to ERISA, Mr. Mudge deserves to recover "a reasonable

      attorney's fee and costs of the action" herein, pursuant to section 502(g)(1) of ERISA, 29

      U.S.C. § 1132(g).

82.    The Defendants have the ability to satisfy the award.

83.    Mr. Mudge's conduct of this action is in the interests of all participants who subscribe to the Plan, and the relief granted hereunder will benefit all participants.

84.    The Defendant's have acted in bad faith in denying Mr. Mudge's benefits under the Plan.

85.    The award of attorneys' fees against the Defendants will deter others acting under the similar circumstances.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays that the Court:

(1)    Declare, adjudge and decree that Mr. Mudge is entitled to ongoing LTD benefits as calculated under the terms of the Plan.

(2)    Award Mr. Mudge the full amount of unpaid benefits under the Plan to which he is entitled, together with such pre-judgment interest as may be allowed by law.

(3)    Order that the Defendants make restitution to Mr. Mudge in the amount of any losses sustained by Mr. Mudge in consequence of the wrongful conduct alleged herein, together with prejudgment interest.

(4)    Award Mr. Mudge the cost of this action and reasonable attorneys' fees; and

(5)    Award such other relief as the court deems just and reasonable.

Date:  November 15, 2004

Respectfully submitted for the Plaintiff,
DAVID MUDGE

By: _____

Mark Bronstein
BBO No. 058640
M. Katherine Sullivan
BBO No. 649239
LAW OFFICE OF MARK BRONSTEIN
288 Walnut Street, Suite 120
Newton, MA 02458
617-244-5551

 **UNUM®**

**GROUP INSURANCE POLICY
NON-PARTICIPATING**

**POLICYHOLDER:**   Compaq Computer Corporation

**POLICY NUMBER:**   24768 001

**POLICY EFFECTIVE DATE:**   January 1, 1999

**POLICY ANNIVERSARY DATE:** January 1

**GOVERNING JURISDICTION:**   Texas

UNUM Life Insurance Company of America (referred to as UNUM) will provide benefits under this policy.  UNUM makes this promise subject to all of this policy's provisions.

The policyholder should read this policy carefully and contact UNUM promptly with any questions.  This policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments.  This policy consists of:

-    all policy provisions and any amendments and/or attachments issued;
-    employees' signed applications; and
-    the certificate of coverage.

This policy may be changed in whole or in part.  Only an officer or a registrar of UNUM can approve a change.  The approval must be in writing and endorsed on or attached to this policy.  No other person, including an agent, may change this policy or waive any part of it.

Signed for UNUM at Portland, Maine on the Policy Effective Date.

President                                        Secretary

UNUM Life Insurance Company of America
2211 Congress Street
Portland, Maine 04122

Copyright 1993, UNUM Life Insurance Company of America

Countersigned by_____
                          Licensed Resident Agent

C.FP-1                    C.FP-1   (1/1/1999) REV

## IMPORTANT NOTICE

This is not a policy of Workers' Compensation Insurance.  The Employer does not become a subscriber to the Workers' Compensation system by purchasing this policy, and if the Employer is a nonsubscriber, the Employer loses those benefits which would otherwise accrue under the Workers' Compensation laws. The Employer must comply with the Workers' Compensation law as it pertains to nonsubscribers and the required notification that must be filed and posted.

## IMPORTANT NOTICE

To obtain information or make a complaint:

You may call UNUM's toll-free telephone number for information or to make a complaint at:

**1-800-321-3889
OPTION NUMBER 2**

You may also write to UNUM at:

Deborah J. Jewett, Manager
Customer Relations
UNUM Life Insurance
Company of America
2211 Congress Street
Portland, Maine 04122

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

**1-800-252-3439**

You may also write the Texas Department of Insurance
P.O. Box 149104
Austin, TX 78714-9104
FAX # (512) 475-1771

## PREMIUMS OR CLAIM DISPUTES:

Should you have a dispute concerning your premium or about a claim, you should contact the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance (TDI).

## ATTACH THIS NOTICE TO YOUR POLICY:

This notice is for information only and does not become a part or condition of the attached document.

## AVISO IMPORTANTE

Para obtener informacion o para someter una queja:

Usted puede llamar al numero de telefono gratis de UNUM para informacion o para someter una queja al:

**1-800-321-3889
OPCION NUMERO 2**

Usted tambien puede escribir a UNUM:

Deborah J. Jewett
Gerente de Relaciones al Cliente
UNUM Life Insurance
Company of America
2211 Congress Street
Portland, Mane 04122

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al:

**1-800-252-3439**

Puede escribir al Departamento de Seguros de Texas
P.O. Box 149104
Austin, TX 78714-9104
FAX # (512) 475-1771

## DISPUTAS SOBRE PRIMAS O RECLAMOS:

Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el la compania primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

## UNA ESTE AVISO A SU POLIZA:

Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

# TABLE OF CONTENTS

BENEFITS AT A GLANCE................................................................................B@G-LTD-1

LONG TERM DISABILITY PLAN........................................................................B@G-LTD-1

CLAIM INFORMATION.................................................................................. LTD-CLM-1

LONG TERM DISABILITY................................................................................LTD-CLM-1

POLICYHOLDER PROVISIONS........................................................................ EMPLOYER-1

CERTIFICATE  SECTION....................................................................................CC.FP-1

GENERAL PROVISIONS.................................................................................EMPLOYEE-1

LONG TERM DISABILITY..................................................................................LTD-BEN-1

BENEFIT INFORMATION................................................................................ LTD-BEN-1

OTHER BENEFIT FEATURES...........................................................................LTD-OTR-1

OTHER SERVICES.........................................................................................SERVICES-1

ERISA.............................................................................................................ERISA-1

GLOSSARY...................................................................................................GLOSSARY-1

# BENEFITS AT A GLANCE

## LONG TERM DISABILITY PLAN

This long term disability plan provides financial protection for you by paying a portion of your income while you are disabled. The amount you receive is based on the amount you earned before your disability began and the monthly benefit option that you chose. In some cases, you can receive disability payments even if you work while you are disabled.

**EMPLOYER'S ORIGINAL PLAN**
**EFFECTIVE DATE:**    January 1, 1999

**PLAN YEAR:**    January 1, 1999 to January 1, 2000
and each following January 1 to January 1

**POLICY NUMBER:**    24768  001

**ELIGIBLE GROUP(S):**

Group 1
All employees excluding employees employed by Digital Equipment Corporation in active employment

Group 2
All employees employed by Digital Equipment Corporation in active employment

**MINIMUM HOURS REQUIREMENT:**

Employees must be working at least 20 hours per week.

**WAITING PERIOD:**

For employees in an eligible group on or before January 1, 1999: None

For employees entering an eligible group after January 1, 1999: None

**REHIRE:**

If your employment ends and you are rehired within 12 months, your previous work while in an eligible group will apply toward the waiting period. All other policy provisions apply.

**WHO PAYS FOR THE COVERAGE:**

**All employees excluding those employees employed by Digital Equipment Corporation**
*Option A*

Your Employer pays the cost of your coverage.

*Option B*

Your Employer pays the cost of your coverage.

*Option C*

You and your Employer share the cost of your coverage.

**All employees employed by Digital Equipment Corporation**
*Option A*

No Coverage

*Option B*

Your Employer pays the cost of your coverage.

*Option C*

You and your Employer share the cost of your coverage.

## ELIMINATION PERIOD:

182 days

Benefits begin the day after the elimination period is completed.

## MONTHLY BENEFIT:

### All employees excluding those employees employed by Digital Equipment Corporation
*Option A*

50% of monthly earnings to a maximum benefit of $5,000 per month.

Your payment will be reduced by deductible sources of income, as described in the section "Deductible Sources of Income" and disability earnings. Some disabilities may not be covered or may have limited coverage under this plan.

*Option B*

60% of monthly earnings to a maximum benefit of $12,500 per month.

Your payment will be reduced by deductible sources of income, as described in the section "Deductible Sources of Income" and disability earnings. Some disabilities may not be covered or may have limited coverage under this plan.

*Option C*

70% of monthly earnings to a maximum benefit of $15,000 per month.

Your payment will be reduced by deductible sources of income, as described in the section "Deductible Sources of Income" and disability earnings. Some disabilities may not be covered or may have limited coverage under this plan.

### All employees employed by Digital Equipment Corporation
*Option A*

No Coverage

*Option B*

60% of monthly earnings to a maximum benefit of $12,500 per month.

Your payment will be reduced by deductible sources of income, as described in the section "Deductible Sources of Income" and disability earnings. Some disabilities may not be covered or may have limited coverage under this plan.

*Option C*

70% of monthly earnings to a maximum benefit of $15,000 per month.

Your payment will be reduced by deductible sources of income, as described in the section "Deductible Sources of Income" and disability earnings. Some disabilities may not be covered or may have limited coverage under this plan.

**MAXIMUM PERIOD OF PAYMENT:**

| Age at Disability | Maximum Period of Payment |
|---|---|
| Less than age 60 | To age 65, but not less than 5 years |
| Age 60 through 64 | 5 years |
| Age 65 through 69 | To age 70, but not less than 1 year |
| Age 70 and over | 1 year |

No premium payments are required for your coverage while you are receiving payments under this plan.

**OTHER FEATURES:**

Continuity of Coverage

Conversion

Minimum Benefit

Pre-Existing: 3/12/12

Survivor Benefit

Note:  All bolded terms are defined within the Glossary.

**The above items are only highlights of this plan.  For a full description of your coverage, continue reading your certificate of coverage section.**

## CLAIM INFORMATION

## LONG TERM DISABILITY

### WHEN DO YOU NOTIFY UNUM OF A CLAIM?

We encourage you to notify us of your claim as soon as possible, so that a claim decision can be made in a timely manner. Written notice of a claim should be sent within 30 days after the date your disability begins. However, you must send UNUM written proof of your claim no later than 90 days after your elimination period. If it is not possible to give proof within 90 days, it must be given no later than 1 year after the time proof is otherwise required except in the absence of legal capacity.

The claim form is available from your Employer, or you can request a claim form from us. If you do not receive the form from UNUM within 15 days of your request, send UNUM written proof of claim without waiting for the form.

You must notify us immediately when you return to work in any capacity.

### HOW DO YOU FILE A CLAIM?

You and your Employer must fill out your own sections of the claim form and then give it to your attending doctor. Your doctor should fill out his or her section of the form and send it directly to UNUM.

### WHAT INFORMATION IS NEEDED AS PROOF OF YOUR CLAIM?

Your proof of claim, provided at your expense, must show:

- that you are under the **regular care** of a **doctor**;
- the appropriate documentation of your monthly earnings;
- the date your disability began;
- the cause of your disability;
- the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation; and
- the name and address of any **hospital or institution** where you received treatment, including all attending doctors.

We may request that you send proof of continuing disability indicating that you are under the regular care of a doctor. This proof, provided at your expense, must be received within 30 days of a request by us.

In some cases, you will be required to give UNUM authorization to obtain additional medical information, and to provide non-medical information as part of your proof of claim, or proof of continuing disability. UNUM will deny your claim, or stop sending you payments, if the appropriate information is not submitted.

The initial payment for a payable claim will be made within 60 days from the date proof is received.

### TO WHOM WILL UNUM MAKE PAYMENTS?

UNUM will make payments to you.

LTD-CLM-1   (1/1/1999) REV

### WHAT HAPPENS IF UNUM OVERPAYS YOUR CLAIM?

UNUM has the right to recover any overpayments due to:

- fraud;
- any error UNUM makes in processing a claim; and
- your receipt of deductible sources of income.

You must reimburse us in full. We will determine the method by which the repayment is to be made.

UNUM will not recover more money than the amount we paid you.

# POLICYHOLDER PROVISIONS

## *WHAT IS THE COST OF THIS INSURANCE?*

The initial premium for each **plan** is based on the initial rate(s) shown below.

## LONG TERM DISABILITY

### *INITIAL RATE*

**All employees excluding those employees employed by Digital Equipment Corporation**
*OPTION A*

Monthly rate of:    .17 % of **total covered payroll.**

*OPTION B*

Monthly rate of:    .31 % of **total covered payroll.**

*OPTION C*

Monthly rate of:    .47 % of **total covered payroll.**

**All employees employed by Digital Equipment Corporation**
*OPTION A*

No Coverage

*OPTION B*

Monthly rate of:    .31 % of **total covered payroll.**

*OPTION C*

Monthly rate of:    .47 % of **total covered payroll.**

### *WAIVER OF PREMIUM*

UNUM does not require premium payments for an insured while he or she is receiving Long Term Disability payments under this plan.

### *RATE GUARANTEE*

A change in premium rate will not take effect before January 1, 2002.  However, UNUM  may change premium rates at any time for reasons which affect the risk assumed, including those reasons shown below:

- a change occurs in this plan design;
- a division, subsidiary, or affiliated company is added or deleted;
- the number of insureds changes by 25% or more; or
- a new law or a change in any existing law is enacted which applies to this plan.

UNUM will notify the Policyholder in writing at least 31 days before a premium rate is changed. A change may take effect on an earlier date when both UNUM and the Policyholder agree.

## WHEN IS PREMIUM DUE FOR THIS POLICY?

Premium Due Dates: January 1, 1999 and the first day of each calendar month thereafter.

The **Policyholder** must send all premiums to UNUM on or before their respective due date. The premium must be paid in United States dollars.

## WHEN ARE INCREASES OR DECREASES IN PREMIUM DUE?

Premium increases or decreases, for other than salary changes, which take effect during a plan month are adjusted and due on the next premium due date following the change. Changes will not be pro-rated daily.

Premium increases or decreases due to salary changes should be adjusted on the first day of the next plan year.

If premiums are paid on other than a monthly basis, premiums for increases and decreases will result in a monthly pro-rated adjustment on the next premium due date.

UNUM will only adjust premium for the current plan year and the prior plan year. In the case of fraud, premium adjustments will be made for all plan years.

## WHAT INFORMATION DOES UNUM REQUIRE FROM THE POLICYHOLDER?

The Policyholder must provide UNUM with the following on a regular basis:

- information about employees:
  • who are eligible to become insured;
  • whose amounts of coverage change; and/or
  • whose coverage ends;
- occupational information and any other information that may be required to manage a claim; and
- any other information that may be reasonably required.

Policyholder records that, in UNUM's opinion, have a bearing on this policy will be available for review by UNUM at any reasonable time.

Clerical error or omission by UNUM will not:

- prevent an employee from receiving coverage;
- affect the amount of an insured's coverage; or
- cause an employee's coverage to begin or continue when the coverage would not otherwise be effective.

## WHO CAN CANCEL THIS POLICY OR A PLAN UNDER THIS POLICY?

This policy or a plan under this policy can be cancelled:

- by UNUM; or
- by the Policyholder.

UNUM may cancel or offer to modify this policy or a plan if:

- there is less than 75% participation of those eligible employees who pay all or part of their premium for a plan; or
- there is less than 100% participation of those eligible employees for a Policyholder paid plan;
- the Policyholder does not promptly provide UNUM with information that is reasonably required;
- the Policyholder fails to perform any of its obligations that relate to this policy;
- fewer than 25 employees are insured under a plan;
- the Policyholder fails to pay any premium within the 31 day **grace period**.

If UNUM cancels this policy or a plan for reasons other than the Policyholder's failure to pay premium, a written notice will be delivered to the Policyholder at least 31 days prior to the cancellation date.

UNUM also reserves the right to set a participation requirement for this policy.

If the premium is not paid during the grace period, the policy or plan will terminate automatically at the end of the grace period. The Policyholder is liable for premium for coverage during the grace period. The Policyholder must pay UNUM all premium due for the full period each plan is inforce.

The Policyholder may cancel this policy or a plan by written notice delivered to UNUM at least 90 days prior to the cancellation date. When both the Policyholder and UNUM agree, this policy or a plan can be cancelled on an earlier date. If UNUM or the Policyholder cancels this policy or a plan, coverage will end at 12:00 midnight on the last day of coverage.

If this policy or a plan is cancelled, the cancellation will not affect a **payable claim**.

## WHAT HAPPENS TO AN EMPLOYEE'S COVERAGE UNDER THIS POLICY WHILE HE OR SHE IS ON A FAMILY AND MEDICAL LEAVE OF ABSENCE?

We will continue the employee's coverage in accordance with the policyholder's Human Resource policy on family and medical leaves of absence if premium payments continue and the policyholder approved the employee's leave in writing.

Coverage will be continued until the end of the later of:

1. the leave period required by the federal Family and Medical Leave of Absence Act of 1993 and any amendments; or
2. the leave period required by applicable state law.

If the policyholder's Human Resource policy doesn't provide for continuation of an employee's coverage during a family and medical leave of absence, the employee's coverage will be reinstated when he or she returns to active employment.

We will not:

- apply a new waiting period;

EMPLOYER-3  (1/1/1999) REV

- apply a new pre-existing conditions exclusion; or
- require evidence of insurability.

## *DIVISIONS, SUBSIDIARIES OR AFFILIATED COMPANIES INCLUDE:*

NAME/LOCATION(CITY AND STATE)

None

# CERTIFICATE SECTION

UNUM Life Insurance Company of America (referred to as UNUM) welcomes you as a client.

This is your certificate of coverage as long as you are eligible for coverage and you become insured.  You will want to read it carefully and keep it in a safe place.

UNUM has written your certificate of coverage in plain English.  However, a few terms and provisions are written as required by insurance law.  If you have any questions about any of the terms and provisions, please consult UNUM's claims paying office.  UNUM will assist you in any way to help you understand your benefits.

If the terms and provisions of the certificate of coverage (issued to you) are different from the policy (issued to the policyholder), the policy will govern.  Your coverage may be cancelled or changed in whole or in part under the terms and provisions of the policy.

The policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments.  When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy.

For purposes of effective dates and ending dates under the group policy, all days begin at 12:01 a.m. and end at 12:00 midnight at the Policyholder's address.

UNUM Life Insurance Company of America
2211 Congress Street
Portland, Maine 04122

CC.FP-1   (1/1/1999) REV

# GENERAL PROVISIONS

## WHAT IS THE CERTIFICATE OF COVERAGE?

This certificate of coverage is a written statement prepared by UNUM and may include attachments. It tells you:

- the coverage for which you may be entitled;
- to whom UNUM will make a payment; and
- the limitations, exclusions and requirements that apply within a plan.

## WHEN ARE YOU ELIGIBLE FOR COVERAGE?

If you are working for your Employer in an eligible group, the date you are eligible for coverage is the later of:

- the plan effective date; or
- the day after you complete your **waiting period**.

## WHEN DOES YOUR COVERAGE BEGIN?

This plan provides different benefit options. When you first become eligible for coverage, you may apply for any option, however, you cannot be covered under more than one option at a time.

### All employees excluding those employees employed by Digital Equipment Corporation

Your Employer pays 100% of the cost of your coverage for Option A and B. If you don't apply for any other option you will automatically be covered under Option B at 12:01 a.m. on the date you are eligible for coverage.

You and your Employer share the cost of your coverage for any other option. You will be covered at 12:01 a.m. on the date you are eligible for coverage, if you apply for insurance on or before that date.

If you first become eligible for coverage after the plan effective date, you will be covered at 12:01 a.m. on the later of:

- the date you are eligible for coverage, if you apply for insurance on or before that date; or
- the date you apply for insurance, if you apply within 31 days after your eligibility date.

### All employees employed by Digital Equipment Corporation

Your Employer pays 100% of the cost of your coverage for Option B. If you don't apply for any other option you will automatically be covered under Option B at 12:01 a.m. on the date you are eligible for coverage.

You and your Employer share the cost of your coverage for any other option. You will be covered at 12:01 a.m. on the date you are eligible for coverage, if you apply for insurance on or before that date.

If you first become eligible for coverage after the plan effective date, you will be covered at 12:01 a.m. on the later of:

- the date you are eligible for coverage, if you apply for insurance on or before that date; or
- the date you apply for insurance, if you apply within 31 days after your eligibility date.

## WHEN CAN YOU CHANGE YOUR COVERAGE BY CHOOSING ANOTHER OPTION?

You can change your coverage by applying for a different option only during an **annual enrollment period**. You can increase your coverage by one level or decrease your coverage any number of levels.

UNUM and your Employer determine when the annual enrollment period begins and ends. A change in coverage that is made during an annual enrollment period will begin at 12:01 a.m. on the first day of the next plan year.

If you end employment and are rehired within the same plan year, you will be insured on your eligibility date for the coverage that you had under the plan when you ended employment. You cannot change your coverage until the next annual enrollment period.

## WHAT IF YOU ARE ABSENT FROM WORK ON THE DATE YOUR COVERAGE WOULD NORMALLY BEGIN?

If you are absent from work due to injury, sickness or leave of absence, your coverage will begin on the date you return to active employment.

## ONCE YOUR COVERAGE BEGINS, WHAT HAPPENS IF YOU ARE NOT WORKING?

If you are absent from work due to reduction in workforce, your coverage will end on the date you receive notification of job elimination.

If you are on a FMLA or military leave of absence, coverage will be extended as required by law.

## WHEN WILL CHANGES TO YOUR COVERAGE TAKE EFFECT?

Once your coverage begins, any increased or additional coverage due to a change in your monthly earnings or due to a plan change requested by your Employer will take effect immediately if you are in active employment or if you are on a covered leave of absence. If you are not in active employment due to injury or sickness, any increased or additional coverage will begin on the date you return to active employment.

Any decrease in coverage will take effect immediately but will not affect a **payable claim** that occurs prior to the decrease.

## WHEN DOES YOUR COVERAGE END?

Your coverage under the policy or a plan ends on the earliest of:

- the date the policy or a plan is cancelled;
- the date you no longer are in an eligible group;
- the date your eligible group is no longer covered;

EMPLOYEE-2  (1/1/1999) REV

- the last day of the period for which you made any required contributions; or
- the last day you are in active employment except as provided under the covered leave of absence provision.

UNUM will provide coverage for a payable claim which occurs while you are covered under the policy or plan.

## WHAT ARE THE TIME LIMITS FOR LEGAL PROCEEDINGS?

You can start legal action regarding your claim 60 days after proof of claim has been given and up to 3 years from the time proof of claim is required, unless otherwise provided under federal law.

## HOW CAN STATEMENTS MADE IN YOUR APPLICATION FOR THIS COVERAGE BE USED?

UNUM considers any statements you or your Employer make in a signed application for coverage a representation and not a warranty. If any of the material statements you or your Employer make are not complete and/or not true at the time they are made, we can:

- reduce or deny any claim; or
- cancel your coverage from the original effective date.

We will use only statements made in a signed application as a basis for doing this. A copy of the statements will be provided to you or your beneficiary. These statements cannot be used to reduce or deny coverage if your coverage has been inforce for at least two years.

However, if the Employer gives us information about you that is incorrect, we will:

- use the facts to determine if you have coverage under the plan according to the policy provisions and in what amounts; and
- make a fair adjustment of the premium.

## HOW WILL UNUM HANDLE INSURANCE FRAUD?

UNUM wants to ensure you and your Employer do not incur additional insurance costs as a result of the undermining effects of insurance fraud. UNUM promises to focus on all means necessary to support fraud detection, investigation, and prosecution.

It is a crime if you knowingly, and with intent to injure, defraud or deceive UNUM, or provide any information, including filing a claim, that contains any false, incomplete or misleading information. These actions, as well as submission of materially false information, will result in denial of your claim, and are subject to prosecution and punishment to the full extent under state and/or federal law. UNUM will pursue all appropriate legal remedies in the event of insurance fraud.

### *DOES THE POLICY REPLACE OR AFFECT ANY WORKERS' COMPENSATION OR STATE DISABILITY INSURANCE?*

The policy does not replace or affect the requirements for coverage by any workers' compensation or state disability insurance.

### *DOES YOUR EMPLOYER ACT AS YOUR AGENT OR UNUM'S AGENT?*

For purposes of the policy, your Employer acts on its own behalf or as your agent. Under no circumstances will your Employer be deemed the agent of UNUM.

# LONG TERM DISABILITY

# BENEFIT INFORMATION

### *HOW DOES UNUM DEFINE DISABILITY?*

You are disabled when UNUM determines that:

- you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury; and**
- you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

After 24 months of payments, you are disabled when UNUM determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

We may require you to be examined by a doctor, other medical practitioner or vocational expert of our choice. UNUM will pay for this examination. We can require an examination as often as it is reasonable to do so. We may also require you to be interviewed by an authorized UNUM Representative.

### *HOW LONG MUST YOU BE DISABLED BEFORE YOU ARE ELIGIBLE TO RECEIVE BENEFITS?*

You must be continuously disabled through your **elimination period.** UNUM will treat your disability as continuous if your disability stops for 60 days or less during the elimination period. The days that you are not disabled will not count toward your elimination period.

Your elimination period is 182 days.

### *CAN YOU SATISFY YOUR ELIMINATION PERIOD IF YOU ARE WORKING?*

Yes, provided you meet the definition of disability.

### *WHEN WILL YOU BEGIN TO RECEIVE PAYMENTS?*

You will begin to receive payments when we approve your claim, providing the elimination period has been met. We will send you a payment monthly for any period for which UNUM is liable.

### *HOW MUCH WILL UNUM PAY YOU IF YOU ARE DISABLED?*

We will follow this process to figure your payment:

**All employees excluding those employees employed by Digital Equipment Corporation**
*OPTION A*

1.  Multiply your monthly earnings by 50%.
2.  The maximum **monthly benefit** is $5,000.
3.  Compare the answer from Item 1 with the maximum monthly benefit.  The lesser of these two amounts is your **gross disability payment**.
4.  Subtract from your gross disability payment any **deductible sources of income**.

The amount figured in Item 4 is your **monthly payment**.

*OPTION B*

1.  Multiply your monthly earnings by 60%.
2.  The maximum **monthly benefit** is $12,500.
3.  Compare the answer from Item 1 with the maximum monthly benefit.  The lesser of these two amounts is your **gross disability payment**.
4.  Subtract from your gross disability payment any **deductible sources of income**.

The amount figured in Item 4 is your **monthly payment**.

*OPTION C*

1.  Multiply your monthly earnings by 70%.
2.  The maximum **monthly benefit** is $15,000.
3.  Compare the answer from Item 1 with the maximum monthly benefit.  The lesser of these two amounts is your **gross disability payment**.
4.  Subtract from your gross disability payment any **deductible sources of income**.

The amount figured in Item 4 is your **monthly payment**.

**All employees employed by Digital Equipment Corporation**
*OPTION A*

No Coverage

*OPTION B*

1.  Multiply your monthly earnings by 60%.
2.  The maximum **monthly benefit** is $12,500.
3.  Compare the answer from Item 1 with the maximum monthly benefit.  The lesser of these two amounts is your **gross disability payment**.
4.  Subtract from your gross disability payment any **deductible sources of income**.

The amount figured in Item 4 is your **monthly payment**.

*OPTION C*

1.  Multiply your monthly earnings by 70%.
2.  The maximum **monthly benefit** is $15,000.
3.  Compare the answer from Item 1 with the maximum monthly benefit.  The lesser of these two amounts is your **gross disability payment**.
4.  Subtract from your gross disability payment any **deductible sources of income**.

The amount figured in Item 4 is your **monthly payment**.

## WHAT ARE YOUR MONTHLY EARNINGS?

"Monthly Earnings" means your gross monthly income from your Employer in effect just prior to your date of disability. It includes your total income before taxes, but does not include deductions made for pre-tax contributions to a qualified deferred compensation plan, Section 125 plan, or flexible spending account. It does not include shift differential, income received from commissions, bonuses, overtime pay, any other extra compensation, or include income received from sources other than your Employer.

## WHAT WILL WE USE FOR MONTHLY EARNINGS IF YOU BECOME DISABLED DURING A COVERED LEAVE OF ABSENCE?

If you become disabled while you are on a covered leave of absence, we will use your monthly earnings from your Employer in effect just prior to the date your absence begins.

## HOW MUCH WILL UNUM PAY YOU IF YOU ARE DISABLED AND WORKING?

We will send you the monthly payment if you are disabled and your monthly **disability earnings**, if any, are less than 20% of your indexed monthly earnings, due to the same sickness or injury.

If you are disabled and your monthly disability earnings are 20% or more of your indexed monthly earnings, due to the same sickness or injury, UNUM will figure your payment as follows:

During the first 12 months of payments, while working, your monthly payment will not be reduced as long as disability earnings plus the gross disability payment does not exceed 100% of indexed monthly earnings.

1. Add your monthly disability earnings to your gross disability payment.
2. Compare the answer in Item 1 to your indexed monthly earnings.

If the answer from Item 1 is less than or equal to 100% of your indexed monthly earnings, UNUM will not further reduce your monthly payment.

If the answer from Item 1 is more than 100% of your indexed monthly earnings, UNUM will subtract the amount over 100% from your monthly payment.

After 12 months of payments, while working, you will receive payments based on the percentage of income you are losing due to your disability.

1. Subtract your disability earnings from your indexed monthly earnings.
2. Divide the answer in Item 1 by your indexed monthly earnings. This is your percentage of lost earnings.
3. Multiply your monthly payment by the answer in Item 2.

This is the amount UNUM will pay you each month.

LTD-BEN-3   (1/1/1999) REV

During the first 24 months of disability payments, if your monthly disability earnings exceed 80% of your indexed monthly earnings, UNUM will stop sending you payments and your claim will end.

Beyond 24 months of disability payments, if your monthly disability earnings exceed 60% of your indexed monthly earnings, UNUM will stop sending you payments and your claim will end.

UNUM may require you to send proof of your monthly disability earnings at least quarterly.  We will adjust your payment based on your quarterly disability earnings.

As part of your proof of disability earnings, we can require that you send us appropriate financial records which we believe are necessary to substantiate your income.

After the elimination period, if you are disabled for less than 1 month, we will send you 1/30 of your payment for each day of disability.

## HOW CAN WE PROTECT YOU IF YOUR DISABILITY EARNINGS FLUCTUATE?

If your disability earnings routinely fluctuate widely from month to month, UNUM may average your disability earnings over the most recent 3 months to determine if your claim should continue.

If UNUM averages your disability earnings, we will not terminate your claim unless:

- During the first 24 months of disability payments, the average of your disability earnings from the last 3 months exceeds 80% of indexed monthly earnings; or
- Beyond 24 months of disability payments, the average of your disability earnings from the last 3 months exceeds 60% of indexed monthly earnings.

We will not pay you for any month during which disability earnings exceed the amount allowable under the plan.

## WHAT ARE DEDUCTIBLE SOURCES OF INCOME?

UNUM will subtract from your gross disability payment the following deductible sources of income:

1.  The amount that you receive or are entitled to receive under:

    - a workers' compensation law
    - an occupational disease law
    - any other **act** or **law** with similar intent.

2.  The amount that you receive or are entitled to receive as disability income payments under any:

    - state compulsory benefit **act** or **law**
    - other group insurance plan
    - governmental retirement system as a result of your job with your Employer.

3.  The amount that you, your spouse and your children receive or are entitled to receive as disability payments because of your disability under:

- the United States Social Security Act
- the Canada Pension **Plan**
- the Quebec Pension Plan
- any similar plan or act.

4.  The amount that you receive as retirement payments or the amount your spouse and children receive as retirement payments because you are receiving retirement payments under:

    - the United States Social Security Act
    - the Canada Pension Plan
    - the Quebec Pension Plan
    - any similar plan or act.

5.  The amount that you:

    - receive as disability payments under your Employer's **retirement plan**
    - voluntarily elect to receive as retirement payments under your Employer's retirement plan
    - receive as retirement payments when you reach the later of age 62 or normal retirement age, as defined in your Employer's retirement plan.

    Disability payments under a retirement plan will be those benefits which are paid due to disability and do not reduce the retirement benefit which would have been paid if the disability had not occurred.

    Retirement payments will be those benefits which are based on your Employer's contribution to the retirement plan.  Disability benefits which reduce the retirement benefit under the plan will also be considered as a retirement benefit.

    Regardless of how the retirement funds from the retirement plan are distributed, UNUM will consider your and your Employer's contributions to be distributed simultaneously throughout your lifetime.

    Amounts received do not include amounts rolled over or transferred to any eligible retirement plan.  UNUM will use the definition of eligible retirement plan as defined in Section 402 of the Internal Revenue Code including any future amendments which affect the definition.

6.  The amount that you receive under Title 46, United States Code Section 688 (The Jones Act).

With the exception of retirement payments, UNUM will only subtract deductible sources of income which are payable as a result of the same disability.

We will not reduce your payment by your Social Security retirement income if your disability begins after age 65 and you were already receiving Social Security retirement payments.

## *WHAT ARE NOT DEDUCTIBLE SOURCES OF INCOME?*

UNUM will not subtract from your gross disability payment income you receive from, but not limited to, the following:

- 401(k) plans
- profit sharing plans
- thrift plans
- tax sheltered annuities
- stock ownership plans
- non-qualified plans of deferred compensation
- pension plans for partners
- military pension and disability income plans
- credit disability insurance
- franchise disability income plans
- a retirement plan from another Employer
- individual retirement accounts (IRA)
- individual disability income plans
- no fault motor vehicle plans
- **salary continuation** or **accumulated sick leave** plans

## *WHAT IF SUBTRACTING DEDUCTIBLE SOURCES OF INCOME RESULTS IN A ZERO BENEFIT? (Minimum Benefit)*

The minimum monthly payment is the greater of:

- $100; or
- 10% of your gross disability payment.

UNUM may apply this amount toward an outstanding overpayment.

## *WHAT HAPPENS WHEN YOU RECEIVE A COST OF LIVING INCREASE FROM DEDUCTIBLE SOURCES OF INCOME?*

Once UNUM has subtracted any deductible source of income from your gross disability payment, UNUM will not further reduce your payment due to a cost of living increase from that source.

## *WHAT IF UNUM DETERMINES YOU MAY QUALIFY FOR DEDUCTIBLE INCOME BENEFITS?*

When we determine that you may qualify for benefits under Item(s) 1., 2., and 3. in the deductible sources of income section, we will estimate your entitlement to these benefits. We can reduce your payment by the estimated amounts if such benefits:

- have not been awarded; and
- have not been denied; or
- have been denied and the denial is being appealed.

Your Long Term Disability payment will NOT be reduced by the estimated amount if you:

- apply for the disability payments under Item(s) 1., 2., and 3. in the deductible sources of income section and appeal your denial to all administrative levels UNUM feels are necessary; and
- sign UNUM's payment option form. This form states that you promise to pay us any overpayment caused by an award.

If your payment has been reduced by an estimated amount, your payment will be adjusted when we receive proof:

- of the amount awarded; or
- that benefits have been denied and all appeals UNUM feels are necessary have been completed. In this case, a lump sum refund of the estimated amount will be made to you.

If you receive a lump sum payment from any deductible sources of income, the lump sum will be pro-rated on a monthly basis over the time period for which the sum was given. If no time period is stated, we will use a reasonable one.

### HOW LONG WILL UNUM CONTINUE TO SEND YOU PAYMENTS?

UNUM will send you a payment each month up to the **maximum period of payment.** Your maximum period of payment is based on your age at disability as follows:

| Age at Disability | Maximum Period of Payment |
|---|---|
| Less than 60 | To age 65, but not less than 5 years |
| Age 60 through 64 | 5 years |
| Age 65 through 69 | To age 70, but not less than 1 year |
| Age 70 and over | 1 year |

### WHEN WILL PAYMENTS STOP?

We will stop sending you payments and your claim will end on the earliest of the following:

- during the first 24 months of payments, when you are able to work in your regular occupation on a **part-time basis** but you choose not to;
- after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to;
- the end of the maximum period of payment;
- the date you are no longer disabled under the terms of the plan;
- the date you fail to submit proof of continuing disability;
- the date your disability earnings exceed the amount allowable under the plan; or
- the date you die.

### WHAT DISABILITIES HAVE A LIMITED PAY PERIOD UNDER YOUR PLAN?

Disabilities due to **mental illness** have a limited pay period up to 24 months.

UNUM will continue to send you payments beyond the 24 month period if you meet one or both of these conditions:

1. If you are confined to a **hospital or institution** at the end of the 24 month period, UNUM will continue to send you payments during your confinement.

LTD-BEN-7  (1/1/1999) REV

If you are still disabled when you are discharged, UNUM will send you payments for a recovery period of up to 90 days.

If you become reconfined at any time during the recovery period and remain confined for at least 14 days in a row, UNUM will send payments during that additional confinement and for one additional recovery period up to 90 more days.

2. In addition to Item 1, if, after the 24 month period for which you have received payments, you continue to be disabled and subsequently become confined to a hospital or institution for at least 14 days in a row, UNUM will send payments during the length of the reconfinement.

UNUM will not pay beyond the limited pay period as indicated above, or the maximum period of payment, whichever occurs first.

UNUM will not apply the mental illness limitation to dementia if it is a result of:

- stroke;
- trauma;
- viral infection;
- Alzheimer's disease; or
- other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment.

## WHAT DISABILITIES ARE NOT COVERED UNDER YOUR PLAN?

Your plan does not cover any disabilities caused by, contributed to by, or resulting from your:

- intentionally self-inflicted injuries
- active participation in a riot
- loss of a professional license, occupational license or certification
- commission of a crime for which you have been convicted under state or federal law
- pre-existing condition.

Your plan will not cover a disability due to war, declared or undeclared, or any act of war.

UNUM will not pay a benefit for any period of disability during which you are incarcerated.

## WHAT IS A PRE-EXISTING CONDITION?

You have a pre-existing condition when you apply for coverage when you first become eligible if:

- you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months just prior to your effective date of coverage; and

- the disability begins in the first 12 months after your effective date of coverage unless you have been **treatment free** for 12 consecutive months after your effective date of coverage.

In addition, this plan will not cover an increase in your coverage made at an annual enrollment period if you have a pre-existing condition. You have a pre-existing condition if:

- you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months just prior to the date your coverage increased; and
- the disability begins in the first 12 months after your coverage increased.

## *ARE INCREASES IN COVERAGE SUBJECT TO A PRE-EXISTING CONDITION?*

**All employees excluding those employees employed by Digital Equipment Corporation, Tandem and Microm, who were insured prior to January 1, 1999**

Option A

Your plan will not provide a maximum monthly benefit in excess of $3,000 which becomes effective on January 1, 1998 for any disability caused by, contributed to by, or resulting from the following pre-existing condition.

You have a pre-existing condition if:

- you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months just prior to January 1, 1998; and
- the disability begins in the first 12 months after January 1, 1998.

Option B

Your plan will not provide a maximum monthly benefit in excess of $7,500 which becomes effective on January 1, 1998 for any disability caused by, contributed to by, or resulting from the following pre-existing condition.

You have a pre-existing condition if:

- you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months just prior to January 1, 1998; and
- the disability begins in the first 12 months after January 1, 1998.

Option C

Your plan will not provide a maximum monthly benefit in excess of $8,750 which becomes effective on January 1, 1998 for any disability caused by, contributed to by, or resulting from the following pre-existing condition.

You have a pre-existing condition if:

- you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months just prior to January 1, 1998; and
- the disability begins in the first 12 months after January 1, 1998.

### WHAT HAPPENS IF YOU RETURN TO WORK FULL TIME AND YOUR DISABILITY OCCURS AGAIN?

If you have a **recurrent disability**, UNUM will treat your disability as part of your prior claim and you will not have to complete another elimination period if:

- you were continuously insured under the plan for the period between your prior claim and your recurrent disability; and
- your recurrent disability occurs within 6 months of the end of your prior claim.

Your recurrent disability will be subject to the same terms of this plan as your prior claim.

Any disability which occurs after 6 months from the date your prior claim ended will be treated as a new claim. The new claim will be subject to all of the policy provisions.

If you are covered under another group long term disability plan on the date of your recurrent disability and are entitled to payments under that plan, you will not be eligible for further payments from UNUM.

# LONG TERM DISABILITY

# OTHER BENEFIT FEATURES

### *WHAT BENEFITS WILL BE PROVIDED TO YOUR FAMILY IF YOU DIE? (Survivor Benefit)*

When UNUM receives proof that you have died, we will pay your **eligible survivor** a lump sum benefit equal to 3 months of your gross disability payment if, on the date of your death:

- your disability had continued for 180 or more consecutive days; and
- you were receiving or were entitled to receive payments under the plan.

If you have no eligible survivors, payment will be made to your estate, unless there is none. In this case, no payment will be made.

However, we will first apply the survivor benefit to any overpayment which may exist on your claim.

### *WHAT IF YOU HAVE A DISABILITY DUE TO A PRE-EXISTING CONDITION WHEN YOUR EMPLOYER CHANGES INSURANCE CARRIERS TO UNUM? (Continuity of Coverage)*

UNUM may send a payment if your disability results from a pre-existing condition if, you were:

- in active employment and insured under the plan on its effective date; and
- insured by the prior policy at the time of change.

In order to receive a payment you must satisfy the pre-existing condition provision under:

1. the UNUM plan; or
2. the prior carrier's plan, if benefits would have been paid had that policy remained in force.

If you do not satisfy Item 1 or 2 above, UNUM will not make any payments.

If you satisfy Item 1, we will determine your payments according to the UNUM plan provisions.

If you only satisfy Item 2, we will administer your claim according to the UNUM plan provisions. However, your payment will be the lesser of:

a. the monthly benefit that would have been payable under the terms of the prior plan if it had remained inforce; or
b. the monthly payment under the UNUM plan.

Your benefits will end on the earlier of the following dates:

1. the end of the maximum benefit period under the plan; or
2. the date benefits would have ended under the prior plan if it had remained in force.

LTD-OTR-1   (1/1/1999) REV

### *WHAT INSURANCE IS AVAILABLE IF YOU END EMPLOYMENT? (Conversion)*

**For all Employees who were insured for 12 consecutive months under this LTD plan or were insured under the prior carrier's LTD plan**
If you end employment with your Employer, your coverage under the plan will end. You may be eligible to purchase insurance under UNUM's group conversion policy. To be eligible, you must have been insured under your Employer's group plan for at least 12 consecutive months. We will consider the amount of time you were insured under the UNUM plan and the plan it replaced, if any.

You must apply for insurance under the conversion policy and pay the first quarterly premium within 31 days after the date your employment ends.

UNUM will determine the coverage you will have under the conversion policy. The conversion policy may not be the same coverage we offered you under your Employer's group plan.

You are not eligible to apply for coverage under UNUM's group conversion policy if:

- you are or become insured under another group long term disability plan within 31 days after your employment ends;
- you are disabled under the terms of the plan;
- you recover from a disability and do not return to work for your Employer;
- you are on a leave of absence; or
- your coverage under the plan ends for any of the following reasons:
  • the plan is cancelled;
  • the plan is changed to exclude the group of employees to which you belong;
  • you are no longer in an eligible group;
  • you end your working career or retire and receive payment from any Employer's retirement plan; or
  • you fail to pay the required premium under this plan.

# OTHER SERVICES

These services are also available from us as part of your UNUM Long Term Disability plan.

### HOW CAN UNUM HELP YOUR EMPLOYER IDENTIFY AND PROVIDE WORKSITE MODIFICATION?

A worksite modification might be what is needed to allow you to perform the material and substantial duties of your regular occupation with your Employer. One of our designated professionals will assist you and your Employer to identify a modification we agree is likely to help you remain at work or return to work. This agreement will be in writing and must be signed by you, your Employer and UNUM.

When this occurs, UNUM will reimburse your Employer for the cost of the modification, up to the greater of:

- $1,000; or
- the equivalent of 2 months of your monthly benefit.

This benefit is available to you on a one time only basis.

### HOW CAN UNUM'S REHABILITATION SERVICE HELP YOU RETURN TO WORK?

UNUM has a vocational rehabilitation program available to assist you to return to work. This program is offered as a service, and is voluntary on your part and on UNUM's part.

In addition to referrals made to the rehabilitation program by our claims paying personnel, you may request to have your claim file reviewed by one of UNUM's rehabilitation professionals. As your file is reviewed, medical and vocational information will be analyzed to determine if rehabilitation services might help you return to gainful employment.

Once the initial review is completed, UNUM may elect to offer you a return-to-work program. The return-to-work program may include, but is not limited to, the following services:

- coordination with your Employer to assist you to return to work;
- evaluation of adaptive equipment to allow you to return to work;
- vocational evaluation to determine how your disability may impact your employment options;
- job placement services;
- resume preparation;
- job seeking skills training; or
- retraining for a new occupation.

### HOW CAN UNUM'S SOCIAL SECURITY CLAIMANT ADVOCACY PROGRAM ASSIST YOU WITH OBTAINING SOCIAL SECURITY DISABILITY BENEFITS?

In order to be eligible for assistance from UNUM's Social Security claimant advocacy program, you must be receiving monthly payments from us. UNUM can

provide expert advice regarding your claim and assist you with your application or appeal.

Receiving Social Security benefits may enable:

- you to receive Medicare after 24 months of disability payments;
- you to protect your retirement benefits; and
- your family to be eligible for Social Security benefits.

We can assist you in obtaining Social Security disability benefits by:

- helping you find appropriate legal representation;
- obtaining medical and vocational evidence; and
- reimbursing pre-approved case management expenses.

# ERISA

## SUMMARY PLAN DESCRIPTION

**Name of Plan:**
The Compaq Computer Corporation Long-Term Disability

**Policy Number:**
24768   001

**Participants Included:**
Refer to Eligible Group(s) under each plan.

**Name and Address of Employer:**
Compaq Computer Corporation
PO Box 692000-040406
Houston, Texas
77269-2000

**Contributions:**
Refer to "Who Pays For Your Coverage" under each plan.

**Plan Identification Number:**
a.  Employer IRS Identification #:  76-0011617
b.  Plan #:  504

**Plan Year Ends:**
December 31

**Plan Administrator, Name,
Address, and Telephone Number:**
Compaq Computer Corporation
PO Box 692000-040406
Houston, Texas
77269-2000
(281) 370-0670

**Agent for Service of
Legal Process on the Plan:**
Compaq Computer Corporation
PO Box 692000-040406
Houston, Texas
77269-2000

## TYPE OF ADMINISTRATION

Insurer Administration

## AMENDING THE EMPLOYER'S ERISA PLAN

The Employer's ERISA plan may be changed in whole or in part by the Employer's company.  Such changes must be in writing and endorsed on or attached to the ERISA plan.

## AMENDING UNUM'S POLICY

The Policy may be changed in whole or in part. The Employer can request a Policy change. Only an officer or registrar of UNUM can approve a change. The change must be in writing and endorsed on or attached to the Policy.

NOTE: If you end active employment, see your supervisor to determine what arrangements, if any, may be made to continue your coverage beyond the date you end active employment.

## WHO CAN CANCEL THE POLICY OR A PLAN UNDER THE POLICY?

The policy or a plan under the policy can be cancelled:

- by UNUM; or
- by the Policyholder.

UNUM may cancel or offer to modify the policy or a plan if:

- there is less than 75% participation of those eligible employees who pay all or part of their premium for a plan; or
- there is less than 100% participation of those eligible employees for a Policyholder paid plan;
- the Policyholder does not promptly provide UNUM with information that is rea- sonably required;
- the Policyholder fails to perform any of its obligations that relate to the policy;
- fewer than 25 employees are insured under a plan;
- the Policyholder fails to pay any premium within the 31 day grace period.

If UNUM cancels the policy or a plan for reasons other than the Policyholder's fail- ure to pay premium, a written notice will be delivered to the Policyholder at least 31 days prior to the cancellation date.

UNUM also reserves the right to set a participation requirement for each coverage option under a plan and to cancel an option if the participation requirement is not met.

If the premium is not paid during the grace period, the policy or plan will terminate automatically at the end of the grace period. The Policyholder is liable for premium for coverage during the grace period. The Policyholder must pay UNUM all pre- mium due for the full period each plan is inforce.

The Policyholder may cancel the policy or a plan by written notice delivered to UNUM at least 90 days prior to the cancellation date. When both the Policyholder and UNUM agree, the policy or a plan can be cancelled on an earlier date. If UNUM or the Policyholder cancels the policy or a plan, coverage will end at 12:00 midnight on the last day of coverage.

If the policy or a plan is cancelled, the cancellation will not affect a payable claim.

## WHAT ARE YOUR RIGHTS UNDER ERISA?

As a participant in this plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA).  ERISA provides that all plan participants shall be entitled to:

- examine, without charge, at the Plan Administrator's office and at other specified locations, all plan documents including insurance contracts, and copies of all documents filed by the plan with the U.S. Department of Labor, such as detailed annual reports and plan descriptions;
- obtain copies of all plan documents and other plan information upon written request to the Plan Administrator.  The Plan Administrator may make a reasonable charge for the copies; and
- receive a summary of the plan's annual financial report.  The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan.

The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries.

No one, including your Employer, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising your rights under ERISA.

If your claim for a benefit is denied, in whole or in part, you must receive a written explanation of the reason for the denial.  You have the right to have your claim reconsidered.

Under ERISA, there are steps you can take to enforce the above rights.  For instance, if you request materials from the plan and do not receive them within 30 days, you may file suit in a federal court.  In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court.  If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court.  The court will decide who should pay court costs and legal fees.  If you are successful, the court may order the person you have sued to pay these costs and fees.  If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about your plan, you should contact the Plan Administrator.

If you have any questions about this statement or about your rights under ERISA, you should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration,

ERISA-3  (1/1/1999) REV

U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

## WHAT IF YOUR CLAIM IS DENIED?

In the event that your claim is denied, either in full or in part, UNUM will notify you in writing within 90 days after your claim form was filed. Under special circumstances, UNUM is allowed an additional period of not more than 90 days (180 days in total) within which to notify you of its decision. If such an extension is required, you will receive a written notice from UNUM indicating the reason for the delay and the date you may expect a final decision. UNUM's notice of denial shall include:

- the specific reason or reasons for denial with reference to those policy provisions on which the denial is based;
- a description of any additional material or information necessary to complete the claim and of why that material or information is necessary; and
- the steps to be taken if you or your beneficiary wish to have the decision reviewed.

Please note that if UNUM does not respond to your claim within the time limits set forth above, you should automatically assume that your claim has been denied and you should begin the appeal process at that time.

## WHAT DO YOU DO TO APPEAL?

If you or your authorized representative appeal a denied claim, it must be submitted within 60 days after you receive UNUM's notice of denial. You have the right to:

- submit a request for review, in writing, to UNUM;
- review pertinent documents; and
- submit issues and comments in writing to UNUM.

UNUM will make a full and fair review of the claim and may require additional documents as it deems necessary or desirable in making such a review. A final decision on the review shall be made not later than 60 days following receipt of the written request for review. If special circumstances require an extension of time for processing, you will be notified of the reasons for the extension, and a decision shall be made not later than 120 days following receipt of the request for review. The final decision on review shall be furnished in writing and shall include the reasons for the decision with reference, again, to those policy provisions upon which the final decision is based.

# GLOSSARY

**ACTIVE EMPLOYMENT** means you are working for your Employer for earnings that are paid regularly and that you are performing the material and substantial duties of your regular occupation.  You must be working at least the minimum number of hours as described under Eligible Group(s) in each plan.

Your work site must be:

- your Employer's usual place of business;
- an alternative work site at the direction of your Employer, including your home; or
- a location to which your job requires you to travel.

Normal vacation is considered active employment.
Temporary and seasonal workers are excluded from coverage.

**ANNUAL ENROLLMENT PERIOD** means a period of time before the beginning of each plan year.

**DEDUCTIBLE SOURCES OF INCOME** means income from deductible sources listed in the plan which you receive or are entitled to receive while you are disabled.  This income will be subtracted from your gross disability payment.

**DISABILITY EARNINGS** means the earnings which you receive while you are disabled and working, plus the earnings you could receive if you were working to your maximum capacity.

**DOCTOR** means:

- a person performing tasks that are within the limits of his or her medical license; and
- a person who is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or
- a person with a doctoral degree in Psychology (Ph.D. or Psy.D.) whose primary practice is treating patients; or
- a person who is a legally qualified medical practitioner according to the laws and regulations of the governing jurisdiction.

UNUM will not recognize you, or your spouse, children, parents or siblings as a doctor for a claim that you send to us.

**ELIMINATION PERIOD** means a period of continuous disability which must be satisfied before you are eligible to receive benefits from UNUM.

**EMPLOYEE** means a citizen or permanent resident of the United States or Canada who is in active employment in the United States with the Employer unless an exception is applied for and approved in writing by UNUM.

**EMPLOYER** means the Policyholder, and includes any division, subsidiary or affiliated company named in the policy.

**GAINFUL OCCUPATION** means an occupation that is or can be expected to provide you with an income at least equal to 60% of your indexed monthly earnings within 12 months of your return to work.

**GRACE PERIOD** means the period of time following the premium due date during which premium payment may be made.

**GROSS DISABILITY PAYMENT** means the benefit amount before UNUM subtracts deductible sources of income and disability earnings.

**HOSPITAL OR INSTITUTION** means an accredited facility licensed to provide care and treatment for the condition causing your disability.

**INDEXED MONTHLY EARNINGS** means your monthly earnings adjusted on each anniversary of benefit payments by the lesser of 10% or the current annual percentage increase in the Consumer Price Index. Your indexed monthly earnings may increase or remain the same, but will never decrease.

The Consumer Price Index (CPI-W) is published by the U.S. Department of Labor. UNUM reserves the right to use some other similar measurement if the Department of Labor changes or stops publishing the CPI-W.

Indexing is only used to determine your percentage of lost earnings while you are disabled and working.

**INJURY** means a bodily injury that is the direct result of an accident and not related to any other cause. Disability must begin while you are covered under the plan.

**INSURED** means any person covered under a plan.

**LAW, PLAN OR ACT** means the original enactments of the law, plan or act and all amendments.

**LEAVE OF ABSENCE** means you are temporarily absent from active employment for a period of time that has been agreed to in advance in writing by your Employer.

Your normal vacation time or any period of disability is not considered a leave of absence.

**LIMITED** means what you cannot or are unable to do.

**MATERIAL AND SUBSTANTIAL DUTIES** means duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified.

**MAXIMUM CAPACITY** means, based on your restrictions and limitations:

- during the first 24 months of disability, the greatest extent of work you are able to do in your regular occupation, that is reasonably available.
- beyond 24 months of disability, the greatest extent of work you are able to do in any occupation, that is reasonably available, for which you are reasonably fitted by education, training or experience.

**MAXIMUM PERIOD OF PAYMENT** means the longest period of time UNUM will make payments to you for any one period of disability.

**MENTAL ILLNESS** means a psychiatric or psychological condition regardless of cause such as schizophrenia, depression, manic depressive or bipolar illness, anxiety, personality disorders and/or adjustment disorders or other conditions. These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment.

**MONTHLY BENEFIT** means the total benefit amount for which an employee is insured under this plan subject to the maximum benefit.

**MONTHLY EARNINGS** means your gross monthly income from your Employer as defined in the plan.

**MONTHLY PAYMENT** means your payment after any deductible sources of income have been subtracted from your gross disability payment.

**PART-TIME BASIS** means the ability to work and earn 20% or more of your indexed monthly earnings.

**PAYABLE CLAIM** means a claim for which UNUM is liable under the terms of the policy.

**PLAN** means a line of coverage under the policy.

**POLICYHOLDER** means the Employer to whom the policy is issued.

**PRE-EXISTING CONDITION** means a condition for which you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines for your condition during the given period of time as stated in the plan.

**RECURRENT DISABILITY** means a disability which is:

- caused by a worsening in your condition; and
- due to the same cause(s) as your prior disability for which UNUM made a Long Term Disability payment.

**REGULAR CARE** means:

- you personally visit a doctor as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s); and
- you are receiving the most appropriate treatment and care which conforms with generally accepted medical standards, for your disabling condition(s) by a doctor whose specialty or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards.

**REGULAR OCCUPATION** means the occupation you are routinely performing when your disability begins. UNUM will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

**RETIREMENT PLAN** means a defined contribution plan or defined benefit plan. These are plans which provide retirement benefits to employees and are not funded entirely by employee contributions. Retirement Plan includes but is not limited to any plan which is part of any federal, state, county, municipal or association retirement system.

**SALARY CONTINUATION OR ACCUMULATED SICK LEAVE** means continued payments to you by your Employer of all or part of your monthly earnings, after you become disabled as defined by the Policy. This continued payment must be part of an established plan maintained by your Employer for the benefit of all employees covered under the Policy. Salary continuation or accumulated sick leave does not include compensation paid to you by your Employer for work you actually perform after your disability begins. Such compensation is considered disability earnings, and would be taken into account in calculating your monthly payment.

**SICKNESS** means an illness or disease. Disability must begin while you are covered under the plan.

**SURVIVOR, ELIGIBLE** means your spouse, if living; otherwise your children under age 25.

**TOTAL COVERED PAYROLL** means the total amount of monthly earnings for which employees are insured under this plan.

**TREATMENT FREE** means you have not received medical treatment, consultation, care or services including diagnostic measures, or taken prescribed drugs or medicines for the pre-existing condition.

**WAITING PERIOD** means the continuous period of time (shown in each plan) that you must be in active employment in an eligible group before you are eligible for coverage under a plan.

**WE, US** and **OUR** means UNUM Life Insurance Company of America.

**YOU** means an employee who is eligible for UNUM coverage.

AMENDMENT NO. 3

This amendment forms a part of Group Policy No. 24768 001 issued to the Policy-holder:

Compaq Computer Corporation

This policy is changed by the addition or deletion of the pages listed below:

| Additions | Deletions |
|---|---|
| ####>PAGE_ADD_AMENDMENT | ####>PAGE_DELETE_AMENDMENT |

The effective date of these changes is January 1, 1999. The changes only apply to disabilities which start on or after the effective date.

The policy's terms and provisions will apply other than as stated in this amendment.

Dated at Portland, Maine on April 4, 2000.

UNUM Life Insurance Company of America

By _____
                    Registrar

If this amendment is unacceptable, please sign below and return this amendment to UNUM Life Insurance Company of America at Portland, Maine within 90 days of April 4, 2000.

**YOUR FAILURE TO SIGN AND RETURN THIS AMENDMENT BY THAT DATE WILL CONSTITUTE ACCEPTANCE OF THIS AMENDMENT.**

Compaq Computer Corporation

By _____
Signature and Title of Officer

Countersigned by _____
                    Licensed Resident Agent

C.AMEND-1          AMEND-1   (1/1/1999) REV



March 11, 2004


MARK BRONSTEIN
288 WALNUT STREET
SUITE 120
NEWTON, MA 02460




RE:    Mudge, Dave W                    DOB: August 18, 1955
       Claim Number:                    514572
       Policy Number:                   24768


Dear Mr. Bronstein:

We are writing with regard to Mr. Mudge's claim for long-term disability benefits, and in response to your letter of January 22, 2004. We regret to advise you that we cannot consider further appellate review of Mr. Mudge's claim. We are writing to explain the basis for this position.

As you know, Mr. Mudge's claim was denied on January 31, 2002. You appealed that decision with your letter of March 8, 2002, which was accompanied by additional information. You also submitted additional information with your letter of April 10, 2002. Mr. Mudge's file, including the new information was further reviewed by our Benefits Center. However, the denial decision was maintained, as communicated in a letter, dated May 22, 2002, and Mr. Mudge's claim was referred for appellate review.

During the course of the appellate review, Mr. Mudge's file was reviewed by our on-site neurologist, Dr. Neuren. On June 10, 2002, the Appeals Specialist contacted you to advise that the results of Dr. Neuren's review did not allow a reversal of the denial decision. However, it was agreed that an extension to July 10, 2002 would be provided to allow you time to complete your review of claim file documentation, and submit any additional supporting data.

On July 22, 2002, we received your letter of July 18, 2002, with accompanying information. The Appeals Specialist's subsequent letter of July 29, 2002 outlined UnumProvident's position regarding Mr. Mudge's entitlement to benefits, and advised that your submission of July 18, 2002 was not timely or complete. However, as a courtesy, a final extension of thirty-days was provided to submit any additional supporting data.

On October 2, 2002, we received your faxed letter requesting an additional two weeks to submit supporting information. We responded with our letter of November 5, 2002, advising that your letter was received five weeks beyond the expiration of the final thirty-day extension, sufficient

time had been extended to allow for submission of information, it was our position that Mr. Mudge's administrative remedies were exhausted, and we would not complete any further review regarding Mr. Mudge's appeal.

You responded with your letter of November 11, 2002, indicating you would be submitting information from Dr. Stein. Our reply of November 21, 2002 reiterated our position regarding Mr. Mudge's administrative remedies.

Your subsequent letter of December 10, 2002, was accompanied by additional information from Dr. Stein. Following further consideration of this matter, an exception was made to review this additional information, and Mr. Mudge's file was referred for further physician review. During the course of that review, it was determined that additional medical data was needed, and that information was provided by your office. Unfortunately, the results of Dr. Neuren's review did not allow us to reverse the denial decision. We communicated our position in a letter, dated March 20, 2003.

On January 27, 2004, approximately ten months following our previous appellate communication, we received your letter of January 22, 2004, which was accompanied by additional information. However, it is our position that this matter is now closed. We will not be completing any further review of Mr. Mudge's claim. In addition, we will not be considering this new information, and we are returning this information to you with this letter.

Mr. Bronstein, if you should have any questions or concerns, please do not hesitate to contact me at 1-800-413-7670, extension 58608.

Sincerely,

*Joel Kenniston*

Joel Kenniston
Appeals Consultant
Unum Life Insurance Company of America

LAW OFFICE OF
# MARK BRONSTEIN

mark@bronsteinlaw.com
kate@bronsteinlaw.com

288 Walnut Street, Suite 120, Newton, MA 02460
Telephone: (617)244-5551 • Fax: (617)249-0599
www.bronsteinlaw.com

Mark Bronstein
M. Katherine Sullivan

January 22, 2003

Joel Kenniston
Lead Appeals Specialist
UnumProvident
PO Box 9548
Portland, ME 04122-5058

RE:    Employee:    David Mudge
       Claim #:     0098690897

JAN 2 7 2004

Dear Mr. Kenniston

This is in regard to the above-referenced claim which was previously denied by UnumProvident (UP) on appeal on March 20, 2003.

I write to provide you with additional information directly bearing on Mr. Mudge's condition during the time period in question and request that you reopen Mr. Mudge's Long Term Disability claim. While I recognize that UP has indicated that it has completed the claims process, I suggest that for the reasons discussed later in this letter, reconsideration at this time would be the correct action and could obviate the necessity for litigation, which otherwise is Mr. Mudge's next step.

## I.    HISTORY OF THE CLAIM AND APPEALS

As you may recall, in 1999 Mr. Mudge was a 44 year old project manager for Compaq when he was diagnosed with MS by neurologist, Agnes Virga, M.D. He treated with Dr. Virga until November 15, 2001 when his care was transferred to another neurologist, Marion Stein, MD, who concurred with the prior diagnosis of MS and has continued to treat him since that time.

Because of his MS, Mr. Mudge had to stop working in November, 1999 and first received short term disability and then long term disability benefits under the Compaq group benefit plan with UPProvident.

On November 26, 2001 the UP claims department had claims investigator, Robert Murphy, meet with Mr. Mudge at his home. In the report from that visit, Mr. Murphy described his personal observations of Mr. Mudge which were very significant neurological manifestations consistent with MS, including trembling, jerking and spasticity throughout the

UnumProvident
January 22, 2004
Page 2

hour long meeting.

The claims department also had Mr. Mudge's file reviewed by an in-house physician, neurologist, Alan Neuren on January 15, 2002. Dr. Neuren offered the opinion that Mr. Mudge had not been properly diagnosed with MS, and was not disabled and that his first neurologist had stated he was "in remission" in March 2001. Based solely on this opinion UP terminated benefits to Mr. Mudge in a letter dated January 31, 2002.

In response to this action, on Mr. Mudge's behalf, I filed an appeal of the termination in March 2002 and subsequently submitted additional medical evidence including a detailed report from Dr. Stein refuting Dr. Neuren's opinion, as well as additional evidence.

I also requested that UP utilize a new neurologist for any further review to ensure a neutral and fair review of the earlier decision which had been predicated on the opinion of Dr. Neuren. Stating that it had no legal obligation to use a different doctor on appeal, UP again sent the file to Dr. Neuren for another review.

On March 14, 2003, Dr. Neuren, not surprisingly, restated his earlier opinion that Mr. Mudge was not disabled or entitled to benefits. He stated that Dr. Virga reported that Mr. Mudge was in remission and that there was no evidence to support that he was not in remission between the point of his last visit with Dr. Virga, November 15, 2001, and the date his benefits were terminated. Based on this report, UP issued another denial dated March 20, 2003.

## II.    ARGUMENT IN FAVOR OF UP AGAIN REVIEWING THIS MATTER AND SEEKING AN OPINION FROM ANOTHER NEUROLOGIST

It is suggested that, as the above summary indicates, UP's decision in this matter was completely driven by the repeatedly expressed opinion of Dr. Neuren that both of Mr. Mudge's board certified, Boston teaching hospital affiliated neurologists were wrong and that their diagnosis and aggressive treatment of Mr. Mudge for MS was incorrect, or at least premature.

This provocative opinion has led at least one of the two physicians involved to inquire as to the possibility of filing a complaint against Dr. Neuren with the appropriate regulatory authorities. Whether or not this is warranted, it demonstrates the advisability of seeking some medical corroboration.

While up until now this writer has been unsuccessful at convincing UP to get another medical opinion in this matter to make sure this is a case worth defending in court, I suggest that the issue be reconsidered in light of the enclosed report I have finally been able to get from Dr. Virga, and also to avoid unnecessary litigation.

UnumProvident
January 22, 2004
Page 3

I think this is a very reasonable course to consider particularly since I imagine that if we are forced to file a federal court ERISA complaint, the first thing your outside counsel will do will be to get another medical opinion to see if their case is defensible.

I believe there is a clear procedural fairness issue here as I have previously pointed out that Dr. Neuren's multi-level involvement in the review of Mr. Mudge's claim was completely inappropriate. You wrote to me on March 4, 2003 and stated that it was UP's position that the regulations in effect prior to January 1, 2002 apply to Mr. Mudge's case and therefore the new regulations which would have precluded Dr. Neuren's repeated participation in Mr. Mudge's case did not apply. Even if this is the case, I would point out to you again that any appellate review in which the doctor being used by the insurance carrier in the appeal is the same doctor whose opinion was relied upon to justify the original decision would not be viewed by an objective observer as a full and fair review. Dr. Neuren's continued involvement in this claim would make anyone skeptical of whether this appeal was conducted in good faith.

**B.    THE MEDICAL EVIDENCE FROM THE CLAIMANT'S TREATING PHYSICIANS IS VERY STRONG AND CLEARLY REBUTS DR. NEUREN'S OPINION**

In a letter previously submitted to UP from Dr. Marion Stein dated December 6, 2002 she reiterated her diagnosis of MS based on her treatment of Mr. Mudge and her clinical findings. She also outlined Mr. Mudge's functional limitations and in very specific detail outlined that her findings were not inconsistent with Dr. Virga's.

In addition, enclosed you will find a letter from Dr. Agnes Virga, Mr. Mudge's previous neurologist. In her letter, Dr. Virga makes clear that at no time was Mr. Mudge "in remission" as Dr. Neuren interpreted the term. She clarifies that her use of that term only meant that Mr. Mudge was not experiencing an exacerbation in his condition. She states that Mr. Mudge continued to have problems with his cognitive functioning, memory, visual disturbances, fatigue and balance that caused him to be unable to work. Dr. Virga makes clear that Dr. Neuren completely misinterpreted her office note. She reiterates that Mr. Mudge continued to have 'quite debilitating symptoms".

Dr. Neuren had relied upon the misinterpretation of Dr. Virga's notes to give support to his conclusion that Mr. Mudge was not suffering any disabling symptoms of MS. Dr. Virga has now clarified that she found Mr. Mudge to be suffering severe symptoms of MS. There is no doubt that Dr. Neuren misinterpreted her notes and there is no evidence whatsoever that supports Dr. Neuren's conclusions.

Dr. Virga's letter, along with the previous letter from Dr. Stein, refute Dr. Neuren's conclusions. It is completely unreasonable for UP to continue to rely upon his opinion considering his misinterpretation of office notes and unsupported conclusions. It is clear that

UnumProvident
January 22, 2004
Page 4

Dr. Neuren's reviews of Mr. Mudge's file were unsupported by the evidence and therefore only served to continuously deny this claimant's condition in order to bolster his own previously rendered faulty opinion.

## C.    UP HAS UNCHARACTERISTICALLY IGNORED THE OBSERVATIONS OF ITS OWN INVESTIGATOR

I would also point your attention to UP's own investigator, Mr. Robert Murphy, who met with Mr. Mudge on November 26, 2001. The observations of Mr. Murphy were not relied upon in the termination of Mr. Mudge's benefits. Mr. Murphy reported that he observed "Mr. Mudge trembled and jerked slightly throughout our conversation, which lasted approximately one hour." He continued on to say that Mr. Mudge is limited by his fatigue and problems with his memory and that "his other major limitation, which was quite noticeable, was his spasticity. As described above, even though he tried to control it, he was spasming throughout our conversation."

Mr. Murphy's report was apparently ignored when the termination decision was made. It is quite unreasonable and suspect for UP to ignore the observations of their own investigator in their benefit determination, especially in light of the fact that these observations support the conclusions of Mr. Mudge's treating physicians and contradict Dr. Neuren's conclusions.

Knowing that UP often relies on the observations of their field investigators to support their decision to terminate benefits it is clearly arbitrary and capricious to ignore such a report where it confirms entitlement to ongoing benefits and directly contradicts the conclusion that the claimant is not symptomatic.

## IV.    CONCLUSION

The record contains overwhelming, detailed support from highly qualified treating MS specialists that Mr. Mudge has MS and has been continuously disabled by MS throughout the life of this claim. The sole basis of UP's termination of benefits is the unsupported opinion of Dr. Neuren, whose involvement in the case at both the initial claim and appeals levels violates the basic tenets of fairness required of fiduciaries by the ERISA statute, even prior to the regulations effective January 2002. The responses of Mr. Mudge's physicians to Dr. Neuren's analysis quite persuasively demonstrates it to be inaccurate and without merit, and there is no other medical opinion or evidence which supports Dr. Neuren's point of view.

I have also enclosed other supporting documents to be included in Mr. Mudge's claim file. These documents provide further support for our contention that UP has not given Mr.

UnumProvident
January 22, 2004
Page 5

Mudge's appeal a full and fair review and that this may constitute a pattern and practice
evidencing arbitrary and capricious behavior on UP's part with regard to its handling of
claims involving MS as well as other conditions.

      If you are not the appropriate person who is authorized to deal with this matter,
please forward this letter accordingly and notify me of who I should be dealing with.

                      Sincerely yours,

                      Mark Bronstein

MB/ks
enclosure

**AGNES VIRGA, M.D.**

NEUROLOGY SERVICE
DIPLOMATE, AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
EMG, EEG

October 30, 2003

Attorney Mark Bronstein
288 Walnut Street
Suite 120
Newton, MA 02460

RE:   David Mudge
DOB:  8/18/55

Dear Mr. Bronstein:

David Mudge had been under my care for MS since March 17, 1999 until November 15, 2001.

David presented initially with double vision. He also had complaints of lightheadedness, dizziness, pressure feeling. Neurological work-up was done and MRI and spinal fluid were consistent with demyelinating disease. Patient received a high dose of intravenous steroid treatment then an oral Prednisone taper. He improved, but never got back to baseline. He continued to have recurrent visual disturbances, double vision, cognitive dysfunctions, memory problems, inability to focus, concentrate, and multitasking. He did have problems with balance, endurance, and occasional urinary frequency. Additional problems with leg pain, neck and back arthritis added to his problems with ability to walk, stand, and balance himself.

Mr. Mudge did have a highly demanding occupation requiring a high level of cognitive functioning, focusing, concentrating, planning, doing projects and multitasking, and it included also some physical ability to walk, move and drive to work on a regular basis.

There is no doubt, based on Mr. Mudge's clinical presentation, imaging study, spinal fluid and laboratory results, that he does have demyelinating disease, MS.

Even if Mr. Mudge did not have severe exacerbations, he did not get back to baseline functioning and continued to have quite debilitating symptoms.

"Remission" in a patient with demyelinating disease does not mean that the patient has no symptoms. "Remission" means that the patient does not have a serious exacerbation. The level of "remission" might even mean being wheelchair bound or totally unable to function or work, but not having any new severe symptoms representing another new focus or MS plaque. Fortunately, "remission" in Mr. Mudge's case did not mean a very severely dysfunctional baseline, but nevertheless represented a continued problem with cognitive functioning, memory,

ACTON PROFESSIONAL CENTER, 411 MASS AVE, SUITE 205, ACTON, MA 01720 TEL (978) 263-2898
EMERSON HOSPITAL HEALTH CARE CENTER, 133 LITTLETON RD.(ROUTE 110), WESTFORD, MA 01886 (978) 589-8900

TO:  Attorney Mark Bronstein
RE:  David Mudge
October 30, 2003
Page 2

recurrent visual disturbances and balance problems. It is totally accepted and not contradicting the diagnosis of demyelinating disease.

During my long neurological practice in this area, most of my current MS patients who are disabled actually are disabled from their jobs not because of severe physical disability, for example being wheelchair bound or paralyzed, but because of cognitive dysfunction and/or severe fatigue. Most of those patients are not able to perform their highly demanding, high profile jobs anymore.

The fact that the patient was not treated with Interferons or Copaxone, regular injection treatments, in no way contradicts the diagnosis of MS. There is no rule in medicine or no guideline in any way which would require serious treatment as a diagnostic criterion for a medical condition. Interferons and Copaxone are usually suggested to relapsing/remitting forms of MS. Those medications have their own limits and own serious side effects anyway, and not all MS patients are candidates in any way for that kind of treatment. Very often we treat patients symptomatically for their fatigue, pain, unsteadiness or cognitive problems.

Apparently Mr. Mudge had a Neuropsychology evaluation, which confirmed the presence of cognitive dysfunction caused by MS. No depression was diagnosed, and that is also an important part because it ruled out the presence of "pseudodementia" of depression, which could mimic cognitive dysfunctions. Apparently this is not the case with Mr. Mudge. Reviewing Dr. Marion Stein's Neurology notes, there are absolutely no inconsistencies between my treatment notes and Dr. Marion Stein's, the patient's current neurologist's evaluation.

I reviewed the notes of Dr. Alan Neuren, dated June 4, 2002. I also reviewed his note from March 14, 2003. The opinion, which was largely made reviewing medical records, is grossly unfounded and not consistent with the current knowledge, diagnostic criteria about MS. I have been following the patient over two years, and Dr. Stein had been following him also for quite awhile now, and followed his neurological status. As far as I understand, Dr. Neuren never saw or examined the patient. His remarks about the clinical picture, MRI results and clinical progression are simply not valid and do not meet the current standards of Neurology related to MS.

In summary, Mr. Mudge does have the valid diagnosis of MS. His persistent clinical symptoms are consistent with the diagnosis of MS, and can fit to the regular clinical course of MS with fluctuating, but baseline, quite disabling symptoms of severe fatigue, memory problems, cognitive dysfunctions, visual disturbances, balance problems and paresthesias in extremities. Besides the MS, he did have other factors making it difficult to perform his job, for example cervical and lumbar radiculopathies.

TO:    Attorney Mark Bronstein
RE:    David Mudge
October 30, 2003
Page 3

In spite of having previous problems with OCD, according to the Neuropsychology evaluation, the patient did not have depression and his cognitive dysfunction is mainly organic related to MS and not related to depression or other psych problems.

Based on all above, it is legitimate and neurologically and medically supported that Mr. Mudge has not been able to perform at his original, cognitively highly demanding occupation. Should you need any further information, please contact me.

Very truly yours,


Agnes Virga, MD

/LDMTS-22
D: 10/30/03
T: 10/31/03

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only)  *David Mudge v. Unum Life Insurance Co.*

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

   __ I.  160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   X II.  195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.  *Also complete AO 120 or AO 121 for patent, trademark or copyright cases

   __ III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.

   __ IV.  220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

   __ V.  150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district, please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   YES ☐  NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
   YES ☐  NO ☒
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES ☐  NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   YES ☐  NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   YES ☐  NO ☒

   A. If yes, in which division do all of the non-governmental parties reside?
      Eastern Division ☐  Central Division ☐  Western Division ☐

   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
      Eastern Division ☐  Central Division ☐  Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
   YES ☐  NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  Mark Bronstein
ADDRESS  288 Walnut Street, Suite 120  Newton MA 02460
TELEPHONE NO. 617-244-5551

(CategoryForm[1].wpd - 10/17/02)

⅊ЈЅ 44   (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

David Mudge

**DEFENDANTS** Unum Life Insurance Co., aka Unum Provident Insurance Co. and Compaq Corporation and Affiliated Companies Long term disability Plan aka Hewlett-Packard Co. Long-term disability Plan

**(b)** County of Residence of First Listed Plaintiff  Hillsborough, New Hampshire
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Law Office of Mark Bronstein
288 Walnut St, Suite 120
Newton MA 02460

Attorneys (If Known)

---

**II. BASIS OF JURISDICTION**   (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

|  | PLF | DEF |  | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. NATURE OF SUIT**   (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **FEDERAL TAX SUITS** | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 740 Railway Labor Act | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | | ☐ 555 Prison Condition | ☒ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 |
| | | | | ☐ 890 Other Statutory Actions |

---

**V. ORIGIN**   (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**  (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

Violation of Employee Retirement Income and Security Act of 1974
29 USC Sec. 1001 et. seq.

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☐ Yes   ☐ No

**VIII. RELATED CASE(S) IF ANY**   (See instructions):
JUDGE
DOCKET NUMBER

DATE
11/22/04

SIGNATURE OF ATTORNEY OF RECORD

---

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____